**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

MATTHEW ROACH, MELISSA LONGO,
GARRETT TITCHEN, and CHRISTINA APPLE,

                              Plaintiffs,

            -against-

T.L. CANNON CORP., d/b/a APPLEBEES, T.L.
CANNON MANAGEMENT CORP., TLC WEST,
LLC, TLC CENTRAL, LLC, TLC UTICA, LLC, TLC
EAST, LLC, and TLC NORTH, LLC; DAVID A.
STEIN, individually and as Owner and Chairman of
T.L. Cannon Corp. and as Director and Chairman of
T.L. Cannon Management Corp.; MATTHEW J.
FAIRBAIRN, individually and as Owner and
President of T.L. Cannon Corp. and as Director and
Chief Executive Officer of T.L. Cannon Management
Corp.; and JOHN A. PERRY, individually and as
Vice-President and Director of Operations of T.L.
Cannon Corp. and as President of T.L. Cannon
Management Corp.

                              Defendants.


**AMENDED COMPLAINT**

JURY TRIAL DEMANDED

CIVIL CASE NO.: 3:10-cv-00591


_____

FLSA COLLECTIVE ACTION

And

CLASS ACTION
_____

## NATURE OF THE CASE

1.     T.L. Cannon Corporation (hereinafter "TL Cannon") owns and operates approximately 53 Applebee's Neighborhood Grill & Bar Restaurants throughout New York State.

2.     In addition to TL Cannon, the other corporate entities named as a defendant in this action are affiliated and wholly owned subsidiary corporations of TL Cannon.  These include, but are not limited to: T.L. Cannon Management Corporation; TLC West LLC; TLC Central LLC; TLC Utica LLC; and TLC North LLC (hereinafter "TLC Companies").

3.     As of the date of this Amended Complaint, TL Cannon owns and operates 61 Applebee's Restaurants, 53 of which are located in New York with the remainder located in Connecticut.

4.     Upon information and belief, TL Cannon's 61 Applebee's Restaurants makes it one of the largest franchise operators of Applebee's Restaurants in the United States.

5.     Upon information and belief, TL Cannon utilizes the TLC Companies as administrative sub-units and payroll companies through which TL Cannon organizes and manages its various Applebee's restaurants based upon geographic location.

6.     Ultimately, TL Cannon determines, manages, controls, and enforces all the terms and conditions of employment for all the named plaintiffs and similarly situated employees, making TL Cannon the ultimate employer of all the named Plaintiffs and similarly situated class members.

7.     Moreover, at all relevant times herein, TL Cannon was the owner of all the above named TLC Companies through which it operated its Applebee's Restaurants.

8.      The Plaintiffs were employed by TL Cannon at various times beginning in 2002 through the early part of 2010.

9.      During all of Plaintiffs' employment, TL Cannon intentionally, repeatedly, and as a matter of corporate custom and policy, failed to adhere to numerous laws, codes, and regulations governing the payment of wages to Plaintiffs, both under New York State law and under the federal Fair Labor Standards Act ("FLSA").

10.     Specifically, and as hereinafter alleged, TL Cannon failed to pay Plaintiffs and similarly situated employees wages and monies due them under both State and Federal law as required by the Fair Labor Standards Act at 29 U.S.C. § 201, *et. seq.*, 29 CFR §§ 541 and 779, *et. seq.*, New York Labor Law Articles 6, 7, and 19, and 12 NYCRR §§ 137 and 142, *et seq.*

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. §§ 201-219 (FLSA); 28 U.S.C. § 1331 (Federal Question); 28 U.S.C. § 1337 (Acts of Congress regulating Commerce); and supplementary jurisdiction under 28 U.S.C. § 1367 (State Claims).

12.     The Court has personal jurisdiction over the defendants pursuant to 28 U.S.C. § 1391(b) & (c).

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and (c).

## PARTIES TO THIS ACTION

*The Named and Class Plaintiffs*

14.     At all times materially relevant to this complaint, Matthew Roach has resided in Broome and Chenango Counties, New York within the Northern District of New York.

15.     At all times materially relevant to this complaint, Melissa Longo has resided in Broome County, New York within the Northern District of New York.

16.     At all times materially relevant to this complaint, Garrett Titchen has resided in Broome County, New York within the Northern District of New York.

17.     At all times materially relevant to this complaint, Christina Apple has resided in Onondaga County, New York within the Northern District of New York.

18.     The named plaintiffs all began working for TL Cannon at some point in time in or after 2001 and they continued to work for TL Cannon up and until late 2009 or early 2010.

19.     As a group, the named plaintiffs have worked in almost every single job description and performed work under every position available in a typical TL Cannon Applebee's restaurant, including Front of the House ("FOH") positions, Back of the House ("BOH") positions, and Key Hourly.

20.     Moreover, all of the allegations in this complaint are based on the first-hand experiences of the named plaintiffs, opt-in plaintiffs and putative class members that have signed declarations attesting to the labor law violations who together have worked in **at least 25** of Defendants' Applebee's Restaurants, and an untold number of interactions with a large number of other TL Cannon employees employed in dozens of other Applebee's Restaurants owned and operated by TL Companies.

21.     Plaintiffs' claims for relief are against TL Cannon, the TLC Companies, and its individual officers, David A. Stein ("Stein"), Matthew J. Fairbairn ("Fairbairn"), and John A. Perry ("Perry") for:

       a.     (First Claim) Failure to pay required laundry fees under New York Labor Law ("NYLL");

       b.     (Second Claim) Failure to pay required uniform fees under NYLL;

     c.       (Third Claim) Failure to pay required additional rate for the 10-hour "spread of hours" as that term is defined and required under NYLL;

     d.       (Fourth Claim) Failure to provide required rest periods and to pay regular time and overtime for all time worked in violation of NYLL;

     e.       (Fifth Claim) Failure to pay regular time and overtime to employees for all time worked in violation of the FLSA;

22.     "Class I" - The proper similarly situated class of individuals for the First, Second, Third, and Fourth Claims for Relief under the NYLL are all persons who at times relevant hereto worked in Defendants' Applebee's Restaurants in New York, were non-exempt employees, and, as broken down into subclasses "A" through "D," were:

     a.       "Class I-A" – employees entitled to but who never received required laundry fees as part of and in addition to their wages as required by NYLL §§ 652, 655, 663, and, particularly, 12 NYCRR § 137-1.8 (First Claim for Relief); and/or

     b.       "Class I-B" – employees entitled to but who never received required uniform fees as part of and in addition to their wages as required by NYLL §§ 652, 655, 663, and, particularly, 12 NYCRR § 137-1.8 (Second Claim for Relief); and/or

     c.       "Class I-C" – employees entitled to but who never received the required additional hour of work time as part of their wages where their "Spread of hours," as that term is defined in 19 NYCRR §§ 137-3.11 and 142-2.18, exceeded 10-hours and payment of the additional hour was required under NYLL §§ 652, 655, 663, and, particularly, 12 NYCRR §§ 137-1.7, 137-2.6, 142-1.1, and 142-2.4 (Third Claim for Relief); and/or

     d.       "Class I-D" – employees entitled to rest periods and to be paid for all hours worked, including those hours as articulated in the Third and Fourth Claims for Relief, but who were not given proper rest periods or paid for all hours to which they were entitled in violation of New York's minimum wage and overtime wage requirements pursuant to NYLL §§ 190, *et seq*, 650, *et seq*, and, particularly, 19 NYCRR §§ 137-1.3 and 142-2.2 (Fourth Claim for Relief).

23.     Upon information and belief, and according to an employee list provided by the Defendants, Class I persons consists of thousands of current and former employees and may very well may exceed 10,000 in total. Upon information and belief, each subclass is comprised of a

majority of the total class members where similarly situated employees may be members of each and every subclass.  Said class is so numerous that joinder of all members is impracticable under the standards of Federal Rule of Civil Procedure § 23 (a) (1).

24.     "Class II" - The proper similarly situated class of individuals for the Fifth Claim for Relief under the FLSA is all persons who at times relevant hereto worked in Defendants' Applebee's Restaurants and:

> Those employees who were not paid regular and/or overtime compensation for all the hours to which they were entitled, including but not limited to those hours as articulated in the Third and Fourth Claims for Relief, when such time was compensable time subject to the regular time and overtime provisions of the FLSA pursuant to 29 U.S.C. §§ 206, 207, and 216 (Fifth Claim for Relief).

25.     Upon information and belief, and according to an employee list provided by the Defendants, the FLSA Class II individuals asserting the Fifth Claim for Relief consists of thousands of current an former employees and may very well may exceed 10,000 in total.  All class members should be able to make claims under the Fifth Claim for relief, which makes collective action under FLSA § 216(b) appropriate.

26.     There are questions of law and fact common to each of the above-described classes and subclasses that predominate over any questions affecting only individual members. Only the amount of individual damages sustained by each class member will vary.

27.     The claims of the named plaintiffs are typical of the claims of each of the above-described classes in that all of the members of each class have been similarly affected by the acts and practices of the Defendants.

28.     The named plaintiffs will fairly and adequately protect the interest of the members of each of the above-described classes, and their interests are not adverse to the interests of the other members of either class.

29.     While collective action for the Class II is appropriate under FLSA § 216(b), class action for the remaining class and subclasses is equally appropriate and superior to other available methods for the fair and efficient adjudication of the controversy under the standards of Federal Rule of Civil Procedure § 23 (b)(2) and/or (3).

_TL Cannon Corporation_

30.     TL Cannon Corporation was co-founded by Defendants David A. Stein and Matthew J. Fairbairn and incorporated in the State of Florida on March 7, 1990.  It maintains corporate offices located at 220 Ponte Vedra Park Drive, Suite 100, Ponte Vedra Beach, Florida, 32082 ("Florida Offices").

31.     TL Cannon is a private company which, upon information and belief, is wholly owned and controlled by Stein and Fairbairn.

32.     TL Cannon obtained the exclusive franchise development rights for Applebee's Neighborhood Grill & Bar Restaurants in New York State (excluding New York City) and most of Connecticut.

33.     TL Cannon was registered to do business in the State of New York on June 27, 1990.

34.     The TL Cannon Florida Offices are primarily responsible for payroll, accounts payable and financial processes for TL Cannon's Applebee's restaurants.

35.     Additional corporate offices are located at 180 Lawrence Bell Drive, Suite 100, Williamsville, New York, 14221 ("New York Offices").

36.     The TL Cannon New York Offices are primarily responsible for public and guest relations, construction, marketing, human resources, benefits, and purchasing for TL Cannon's Applebee's restaurants.

37.     TL Cannon's first Applebee's Restaurant was opened on March 12, 1991 in Rochester, New York, and, upon information and belief, was directly operated by TL Cannon.

38.     The Applebee's restaurants owned and operated by TL Cannon vary somewhat in size and dimensions, but, on average, the typical restaurant has between 37 and 50 tables and can serve between 160 and 225 guests at one time.  On a typical high-volume night such as Friday night, the restaurant can turn over every table in the restaurant to new customers about once every hour.

*TL Cannon Management Corp. & TLC Companies*

39.     Over the years, the number of TL Cannon owned and operated Applebee's has grown to 61 stores with 53 of those stores located in New York State as of the date of this complaint.

40.     Upon information and belief, in order to more efficiently operate and manage the franchised Applebee's restaurants under TL Cannon's control, Stein and Fairbairn created additional TLC Companies to help organize, systematize, and streamline operations of the various individual restaurants.

41.     Accordingly, T.L. Cannon Management Corporation (originally T.L. Cantina, Corp.) was founded and incorporated in the state of Florida on December 21, 1994.

42.     T.L. Cannon Management Corporation has the same officers and is located at the same Florida and New York Offices as TL Cannon Corporation.

43.     T.L. Cannon Management Corporation was registered to do business in the State of New York on February 6, 1997.

44.     Upon information and belief, TL Cannon Management Corp. is the entity that directly employs the company's officers and upper level employees (employees who do not work

in a specific Applebee's restaurant, such as Regional Directors of Operations – R.D.O.'s – and lower level D.O.'s).

45.     Upon additional information and belief, TL Cannon Management Corp. is also the entity through which Stein, Fairbairn and Perry directly oversee and manage TL Cannon's various individual restaurants, including the setting and enforcement of company wide policies, objectives, and goals.

### *TL Cannon Corp. & TLC Companies*

46.     As the size and number of TL Cannon's Applebee's Restaurants have grown over the years, Stein and Fairbairn also created various domestic limited liability companies registered in New York State to further organize TL Cannon's Applebee's Restaurants by "regions."

47.     As such, the following wholly owned and controlled companies were created and incorporated in New York State as part of TL Cannon's corporate structure to organize, control, and manage TL Cannon's various New York State Applebee's restaurants:

      a.    TLC Central, LLC, registered with the State of New York Dept. of State on June 3, 1998; and

      b.    TLC West, LLC, registered with the State of New York Dept. of State on June 3, 1998; and

      c.    TLC North, LLC, registered with the State of New York Dept. of State on May 17, 2004; and

      d.    TLC Utica, LLC, registered with the State of New York Dept. of State on October 16, 2006.

48.     To organize, control, and manage TL Cannon's Connecticut Restaurants, TLC East, LLC, was created and incorporated with the State of Connecticut's Department of State on June 5, 1998.

49.     Upon information and belief, the above referenced domestic LLC's provide a natural geographic organizational structure for TL Cannon's various Applebee's restaurants and

are utilized as payroll companies for the employees of the individual stores located within the region's covered by the above named companies.

50.     For example, upon information and belief, payroll and other corporate operations for TL Cannon's Applebee's stores in Western New York are organized through TLC West, LLC, and all employees of those restaurants, both hourly and manager, receive paychecks issued under TLC West, LLC.

51.     Moreover, upon information and belief, all of the above named companies are under the effective control of TL Cannon with Stein, Fairbairn, and Perry serving as the sole officers of each company.

_TL Cannon Individual Defendants_

52.     Stein and Fairbairn are also the co-founders and, upon information and belief, the sole owners of TL Cannon Corp. and TL Cannon Management Corp.

53.     Upon information and belief, Defendant Stein is the Chairman for both TL Cannon Corp. and TL Cannon Management Corp.

54.     Upon information and belief, Defendant Stein is also the co-owner and an officer of TLC Central, LLC, TLC West, LLC, TLC North, LLC, TLC Utica, LLC, and TLC East, LLC.

55.     Upon information and belief, Defendant Fairbairn is the President of TL Cannon Corp. and the Chief Executive Officer of TL Cannon Management Corp.

56.     Upon information and belief, Defendant Fairbairn is also the co-owner and President of TLC Central, LLC, TLC West, LLC, TLC North, LLC, TLC Utica, LLC, and TLC East, LLC.

57.     Upon information and belief, Defendant Perry is the Director of Operations for TL Cannon and the President of TL Cannon Management Corp.

58.     Upon information and belief, Defendant Perry is directly in charge of the overall operations of TL Cannon's Applebee's Restaurants and Perry reports directly to Defendants Stein and Fairbairn.

59.     As such, Perry is primarily responsible for implementing Stein and Fairbairn's business decisions as they pertain to TL Cannon's Applebee's Restaurants, including but not limited to decisions concerning company labor guidelines, store budgets, and other financial controls.

60.     Stein, Fairbairn, and Perry have been involved with TL Cannon's operation of Applebee's Restaurants in New York State since TL Cannon's initial formation in 1990.

## FACTUAL BASIS FOR CLAIMS

61.     Since its initial founding in the early 1980's, the Applebee's concept has mostly operated within the "family dining" segment of the overall restaurant industry through franchise agreements between independent owner-operators and Applebee's International, Inc. ("AII").

62.     TL Cannon also employs hourly personnel in specifically identified job codes and descriptions, which, upon information and belief, are also approved by AII as part of the standard model for operations of an Applebee's Restaurant.

63.     The individual job codes for TL Cannon's Applebee's Restaurants are roughly organized into three generic departments: Back of the House Employees ("BOH"); Front of the House Employees ("FOH"); and Key Hourly Managers ("Key").

**BOH Employees**

64.     BOH Employees' various job codes depend on the specific work being performed.  BOH employees include General Utility Dishwashers ("GU"), Prep Cooks ("Prep"), Line Cooks ("Line") and Expediters ("Expo").

65.     All four of the BOH job positions are non-tipped hourly positions paid at or slightly above minimum wage.  As such, the typical BOH employee's hourly wage ranges from the federal minimum wage of $7.25 per hour to approximately $12.00 per hour.

*GU Employees*

66.     GU employees are primarily responsible for washing dishes for the entire restaurant as well as doing general utility cleaning such as sweeping the parking lot for debris and cleaning the bathrooms.

67.     For all time relevant to this complaint, it has been the long-time, typical practice often required by TL Cannon's labor and scheduling guidelines that a GU only be scheduled during the day for weekend business (Fri., Sat., and Sun) and at night throughout the week as a way to save labor.

68.     As such, during those time periods when no GU is scheduled, it is expected that the manager and servers "maintain" the dish machine area by washing dishes and silverware and by scrubbing pots and pans as necessary.

69.     While the line cooks are also expected to help out in between cooking orders in the kitchen, they are only expected to do so where there is enough labor dollars remaining in the budget for the cooks to help with the dishes as opposed to being asked to punch out and go home.

*Prep Employees*

70.     Prep employees are primarily responsible for preparing a large variety of daily fresh items for use by the Line Cooks in their preparation of the restaurant's various menu items.

71.     Prep cooks are responsible for dozens of prep items, which can include such responsibilities as the preparation of upwards of eight-20 pound batches of mash potatoes from scratch or slicing ten pounds of tomatoes for use in sandwiches and salads.

72.     At minimum, a typical a prep employee is scheduled to start work at 8:00 a.m. in the morning every day of the week and work between a five and eight hour shift with two prep employees likely scheduled on Friday and Saturday to deal with the increased business volume.

73.     In or about late 2007 and early 2008, TL Cannon modified its labor scheduling guidelines and budgets for its Applebee's Restaurants as part of a multi-year long trend to lower same store labor budgets and expense wherein the company effectively abolished the "Prep" position on all but the busiest days (i.e., Mother's Day, Valentines Day) and/or times of the year.

74.     Accordingly, many of the required menu items and ingredients previously prepared by Prep employees are now assigned to Line employees as part of the Line Cook's daily prep work or, more likely, prepared by the managers as part of the manager's responsibility in "managing" the restaurant on the morning and afternoon shifts.

*Line Cooks*

75.      Line Cooks are generally broken up into three stations, Broil, Mid, and Fry.  The standard kitchen layout for an Applebee's Restaurant (if you were facing the kitchen from point of view of a server) includes the Broil on the left, Fry on the right, and Mid straight ahead and in the middle between Broil and Fry.

76.     Employees on the various stations work together through a computerized Kitchen Display System ("KDS") that utilizes individual monitors and control pads above each station to inform employees on those stations which menu items they need to prepare and in what order they need to prepare them.

77.     Only during the slowest periods of business (approx. 15 guests or less in the entire restaurant) is a typical Line Cook able to work more than one station.  During lunch periods, dinner periods, weekends, and any other time the restaurant is busy, a Line Cook is only able to work the station to which he or she is assigned.

78.     Moreover, during higher volume periods (i.e., a Friday night from 4:00 p.m. to 10:00 p.m.), there are typically two or three cooks assigned to each station for a total of between six to eight line cooks scheduled in the kitchen.

79.     More importantly, it is nearly impossible for a Broil Cook to also be concerned with, or even help out on the Fry station of the line, both because of the physical separation of the stations and because there is too much work on the Broil station to even be aware of what is happening on another station.

80.     As such, when a Line Cook is working any one station during any time other than the slowest time periods, it is nearly impossible for that Line Cook to also work another station, or to even know what is happening on another station without actually working on it.

*Expo Employees*

81.     Opposite the three stations on the cook's line and in the area where servers pick up completed orders to deliver to tables is a series of steel service counters underneath heat lamps for keeping prepared food warm.  It is in this area, known as "the Window," that cooks place finished plates ready for service to the guests.

82.     The employee who works at the Window is called Expo.  The Expo's job is to take plates out of the Window, add garnishes, sauces, and dressings, and then arrange the plates on a service counter just below the Window for servers to deliver to the appropriate tables.

83.     In addition to the KDS monitors on each station of the line, there is a KDS monitor above the Expo service counter indicating which orders are ready, what items a table may be waiting on, and which station in the kitchen is running behind on its dishes.

84.     Expo uses all of the above information to serve as a liaison between servers who are looking for plates to take their tables and cooks who are preparing those plates, which also serves to maximize the speed and efficiency at which food reaches a particular table.

85.     For all time relevant to this complaint, in all but the slowest of time periods, it is nearly impossible to successfully run the restaurant without an employee solely dedicated to the position of Expo.  This is so because if the food is not taken out of the Window and served to tables nearly as fast as it is produced by the kitchen, the food becomes too hot and dried out, the cooks quickly run out of room in the Window to put completed plates, and the entire kitchen has to eventually stop cooking altogether until some of the orders in the Window are pulled and served to guests.

### BOH Uniforms

86.     Up and until late 2009, TL Cannon required all BOH employees' uniforms to conform to the following: black, non-slip, dress-type work shoes (no sneakers, clogs, work boots, loafers, etc); blue or black jeans with no holes, tears or rips; belt; a TL Cannon provided Applebee's logo cook T-shirt or polo; a TL Cannon provided Applebee's logo hat; and a BOH approved apron.

87.     Two of the Applebee's logo hats and shirts were typically supplied to the BOH employee by the restaurant upon hire with two replacement shirts and hats provided on the employee's yearly anniversary date.   Additional shirts or hats beyond the two yearly replacements could be purchased directly from the store by the employee.

88.     Only the BOH approved aprons were supplied by the restaurant on a daily basis at the beginning of each BOH employee's shift.  At the end of the shift, the employee would place the soiled apron in a laundry bag, which was collected weekly by a laundry vendor, who would then bring a new supply of aprons and cleaning towels for the following week.

89.     The shoes required as part of TL Cannon's employee uniform standards were so specific, TL Cannon provided a service to allow employees to order from a limited selection of approved shoes through "Shoes for Crews" (a national company specializing in workplace safety shoes).   The shoes were delivered directly to the restaurant and paid for through a deduction from the employee's paycheck split over two weeks.

90.     In 2009, TL Cannon abruptly changed its BOH uniform policy and **no longer allowed** any BOH employee to wear any article of clothing with "Applebee's" name on it.

91.     In fact, all of the shirts and hats previously provided by TL Cannon are now banned articles of clothing and not allowed to be worn by any BOH employee.  In its place, BOH employees were now required to wear a non-descript t-shirt and a baseball cap of their choosing.

92.     Moreover, TL Cannon has always required that BOH employee uniforms be laundered, clean and stain free, free of holes, rips, or tears, and the employee's shoes be in good repair at the beginning of every shift.  Finally, failure to have the proper uniform, including the proper shoes, is grounds for disciplinary action up to and including termination.

93.     TL Cannon never reimbursed any BOH employee under either uniform policy for their purchase of required uniform or shoes, never provided a laundry service for employee uniforms, and never paid laundry fees to its employees.

94.     While the reason for TL Cannon's abrupt change in its BOH uniform policy is unknown, upon information and belief, it appears to be a response to defendants' prior obligation for uniform and laundry fees and an attempt to avoid incurring such obligations in the future.

**FOH Employees**

95.     Like BOH Employees, FOH employees various job codes depend on the specific work being performed.  FOH employees include: Host; Server; Bartender; and Carside ToGo ("Carside") employees.

96.     Hosts and Carside employees, while they do receive nominal tips, are classified as non-tipped hourly employees and paid the New York minimum wage of $7.25 per hour.

97.     Servers and Bartenders are classified as tipped employees and are paid the applicable New York minimum wage for servers of $4.65 per hour.

98.     Moreover, every server is required to tip-share under TL Cannon's employee guidelines.  As such, at the end of every shift, each individual server is expected to "share" 2% of their gross sales for that shift in tip-pool money for "services" provided by other employees, half of which is given to the bartender and the other half to the hosts.

99.     For example, if a server's checkout at the end of their shift reveals they did $900 in sales for that shift and made $80 in tips, that server is expected to pay the bar $9 (1% of $900) and the host(s) $9 (same), thereby netting $64 in earned tips for that shift.

*Hosts and Hostesses*

100.   Hosts are primarily responsible for greeting guests at the front door as they enter the restaurant and seating those guests at available tables.

101.   Hosts are also responsible for "busing" tables, which simply means cleaning off tables of any dirty dishes or cups, wiping the table with a clean sanitized cloth, picking up anything on the floor, and resetting the table with new silverware.

102.   When multiple hosts are scheduled on particularly busy nights (Friday and Saturday), duties are usually split between various hosts for greeting, seating, and busing.

103.   For all time relevant to this complaint, it is typical practice and has long been required by TL Cannon's labor and scheduling guidelines that a Host only be scheduled during peak dinner hours and only during the busier days of the week for lunch (i.e., Thursday though Sunday).

104.   As such, during those times when no Host or not enough Hosts are scheduled, it is expected that the manager and servers "maintain" the dining room by greeting, seating, busing, and cleaning as needed so that the restaurant as a whole can continue to seat and serve guests as quickly as possible.

*Servers*

105.   Servers are primarily responsible for taking guests' food and beverage order, making sure the items ordered are delivered to the guests' table in the appropriate time, taking payment from the guest at the table when they are ready to leave, and attending to whatever other needs the guest may have.

106.   For all time relevant to this complaint, TL Cannon's scheduling and labor guidelines for a typical Applebee's usually allowed and continue to allow for between 5 and 7

servers for a slower lunch to upwards of 10 to 12 servers for the busiest lunch shifts.  Dinner shift scheduling usually allows for between 6 and 8 servers for a slower dinner with upwards of 13 to 14 servers for the busiest dinner shifts.

107.   Servers are also scheduled by station numbers starting at "1" and going up through the numbers of servers working a particular shift.  For example, if there are 8 servers for a Wednesday night dinner shift, then the restaurant's tables are divided up into 8 stations and the servers are assigned station numbers 1 through 8.

108.   When business slows down and some servers are allowed to leave, the highest numbers are sent home first leaving the lowest numbered servers as the "closers" for that particular shift (either a lunch or dinner "closer").  Moreover, the lower numbered servers typically have better sections with more tables so that they can make more money than the higher numbered servers.

109.   At the end of a particular Server's shift, he or she runs a "closeout" report that details that server's sales and financial information for that shift, including how much cash the Server is responsible for turning in to the manager for that shift.

110.   The report indicates how much money the Server must turn in to the manager based on the number of guest checks the Server closed for guests, some by cash and some by credit card.  The money left over after paying the restaurant and tipping out Hosts and Bartenders is the Server's take home tips for that evening.

111.   When the Server attempts to punch out for the evening after turning in his/her closeout report and money, the computer system requires servers to enter in the amount of tips they made for that shift.

112.    If the server attempts to enter an amount less than a pre-determined percentage set in the computer by TL Cannon, which upon information and belief is 12.5% of a server's total sales, the computer will not let the employee finishing clocking out.

113.    The employee must request a manager to swipe a manager's card to override the system, at which point the manager usually "counsels" the employee that low tips are sign of poor service (as opposed to having simply received poor tips or for any other reason) and that future "examples" of poor service can result in additional disciplinary action, including loss of the privilege to work a lower number or loss of shifts altogether.

### *Bartenders*

114.    Bartenders are primarily responsible for making all alcoholic and non-alcoholic drinks for the entire restaurant aside from drinks that can be prepared directly by servers (i.e., soda, ice tea, coffee, hot tea, and lemonades).

115.    Bartenders are also responsible for the full service of guests who chose to sit at the bar instead of at a regular table in the restaurant.

116.    Bartenders (along with servers who help when available) are also responsible for the restaurant's Carside ToGo business when a Carside employee is not scheduled.

117.    For all time relevant to this complaint, it was and is typical practice and often required by TL Cannon's labor and scheduling guidelines that there is a bartender scheduled to work from open to close.  On busier shifts (such as Friday dinners), there can be two bartenders scheduled to handle the increased volume.

118.    However, it is typical practice and often required by TL Cannon's labor and scheduling guidelines that on most shifts, only one bartender is scheduled to work.  As a result, the restaurant manager is ultimately responsible for working the bar during the bartender's

required meal break in the event the bartender is given a meal break on their particular shift and during any other time the bartender is busy enough to need help.

### *Carside To Go*

119.    Carside Employees are responsible for answering the phones, taking orders for Carside To Go guests, packaging those orders, delivering them to the waiting guests in their cars, and taking payment for the Carside orders.

120.    While not nearly as often as a regular table in the restaurant, a Carside customer will occasionally provide a tip to a Carside employee for taking care of their order.

121.    Carside service is normally available in every restaurant from opening and until approximately 10:00 p.m.

122.    However, For all time relevant to this complaint, it was and is typical practice and often required by TL Cannon's labor and scheduling guidelines that employees are only scheduled to work as Carside employees during the busiest shifts, such as from 5:00 to 8:00 p.m. during dinner.

123.    As a result, when there is no Carside employee scheduled and the restaurant is busy, the manager is ultimately responsible for working the Carside portion of the restaurant, especially when the bartender is too busy to do so.

*FOH Uniforms*

124.    Up and until approximately late 2007, TL Cannon required all FOH employees' uniforms to conform to the following: black, non-slip, dress-type work shoes (no sneakers, clogs, work boots, loafers, etc); black dress slacks; belt; a TL Cannon provided Applebee's logo polo shirt; and a TL Cannon provided FOH apron for servers.

125.    Like BOH employees' uniforms, TL Cannon provided two shirts to each FOH employee upon hire with replacement shirts provided on the employee's yearly anniversary date.

126.    Additional polo shirts beyond the two yearly replacements could be purchased directly from the store by employees.  TL Cannon also provided one FOH server's apron on the same yearly basis as the required polo shirts.

127.    Also like the BOH employee's uniform, the TL Cannon's guidelines for required shoes were so specific the company permitted FOH employees to purchase from a limited selection of TL Cannon approved shoes through "Shoes for Crews" (a national company specializing in workplace safety shoes), have the ordered shoes delivered directly to the restaurant, and then pay for the shoes through a deduction from the employee's paycheck

128.    FOH employees were responsible for purchasing and providing the required shoes, pants, and belt under the TL Cannon uniform policy.

129.    In 2007, TL Cannon abruptly changed its FOH uniform policy and **no longer allowed** any FOH employee to wear any of the previously provided Applebee's logo polo shirts.

130.    In place of the polo shirts, TL Cannon now required all FOH employees to purchase and wear black, full buttoned-down, short sleeve or long sleeve dress shirts to match the required black dress slacks and black dress shoes.

131.    Moreover, TL Cannon required that FOH employee uniforms (including aprons) be laundered, clean and stain free, free of holes, rips, or tears, and the shoes be in good repair at the beginning of every shift.  Finally, failure to have the proper uniform, including the proper shoes, would be grounds for disciplinary action.

132.    TL Cannon never reimbursed any FOH employee under either uniform policy for their purchase of required uniform clothing or shoes, never provided a laundry service for employee uniforms, and never paid laundry fees to its employees.

133.    While the reason for TL Cannon's abrupt change in its FOH uniform policy is unknown, upon information and belief, it appears to be a response to defendants' prior obligation for uniform and laundry fees and an attempt to avoid incurring such obligations in the future.

### Key Hourly Employees

134.     Key employees are hourly employees scheduled to work regular "management" shifts when a particular store is either "short" a manager or it needs to cover a management shift for some reason.

135.    Within each of the various jobs codes identified above, there are approved trainers tasked with training new employees hired by the restaurant.  As trainers, these employees typically receive $.50 more per hour on those shifts where they are training.

136.    Key employees are typically TL Cannon approved Line Cook or Server trainers who are promoted to be Key employees and given additional cross-training in other areas of the restaurant as well as in completing management paperwork.

137.    Upon information and belief, most key employees can do anything a regular "manager" can do.

138.    Upon information and belief, for all times relevant to this complaint, a typical Key employee is usually paid between $11.00 and $13.00 per hour on an hourly basis, works at least a 10 hour management shift when working as a Key, and performs all the duties and functions of a regular restaurant manager.

139.    At all times relevant hereto, required uniforms for Key employees are the same as for regular managers, which is black dress shoes (Shoes for Crews), black dress slacks, black or brown belt, and TL Cannon provided Applebee's logo dress shirts.

140.    Two of the Applebee's logo dress shirts were typically supplied to the Key employee once that employee began working management shifts.  However, like with all other hourly employee uniforms, replacements were only provided on the employee's yearly anniversary date, but, the Key employee could purchase additional shirts directly from the restaurant.

141.    TL Cannon never reimbursed any Key employee for their purchase of required uniform clothing, never provided a laundry service for employee uniforms, and never paid laundry fees to its employees.

**Common Labor Issues To All Employees**

142.    For all time relevant to this complaint, TL Cannon's scheduling and labor guidelines for their Applebee's restaurants have placed and continue to place an extreme emphasis on "conservative" scheduling of hourly employees to limit overall payroll expenditures for hourly employee payroll coupled with careful monitoring on an hour by hour and shift by shift basis of those expenditures.

143.    Upon information and belief, over the last six years and during all times relevant hereto, TL Cannon has continually revised, reduced, restricted, and tightened labor scheduling

guidelines by reducing individual all of its store's individual labor budgets to compensate for increased operating costs and to continue to create increasing, same store profits and profit margins.

144.    Upon information and belief, the reduction of individual store labor budgets has inevitably resulted in a lower number of on average total employees per restaurant, less employee hours per restaurant being scheduled on any given day over and during a typical week, and increased manager responsibility to perform and complete any uncompleted hourly work assignments on a shift by shift and week by week basis.

145.    Simply, the drastic reduction of labor budgets and available labor hours for scheduling over the last six years during all times relevant hereto has caused and required those employees who are scheduled and continue to be scheduled to do more work per shift and the individual managers of those shifts to be required to spend an overwhelming majority of their work time doing non-exempt, hourly duties and work functions.

146.     One consequence of the resulting change in labor guidelines has been increased scheduling of both BOH and FOH employees on "double" shifts.

147.    Many of these double shifts would require an employee to be in the restaurant anywhere from 10 to 13 hours in a single day.

148.    For example, a Line Cook might be scheduled to open Mid on a Friday and be scheduled from "9:00 a.m. – V" where "V" means "Volume" (i.e., the Cook will be sent home as soon as his prep work is complete and the business has slowed down enough him to leave).

149.    However, that same Line Cook might also be scheduled that same day on Broil from "5:00 – DV" where "DV" means "Dinner Volume" (i.e., the Cook will be sent home from

the night shift as soon as the closer on the Broil station has had a break and dinner business has slowed down).

150.     In the above example, the Line Cook might start work at 9:00 a.m. and be sent home at 2:00 p.m., return at 5:00 p.m. and then be sent home at 9:30 p.m.  On a different day with a higher level of business, that same Line Cook might only get a half hour break from 4:30 p.m. to 5:00 p.m. and work straight through the rest of the time from 9:00 a.m. to 9:30 p.m.

151.     The scheduling and work example given above is only one of an infinite number of common examples that applies in varying degrees of occurrence to every TL Cannon restaurant and every TL Cannon employee, regardless of region or job code.

152.     While Servers, along with Line Cooks, are the most likely employees to be scheduled and/or asked to work "double" shifts on a daily and weekly basis referenced by the example above, all employees and all job codes are available and at some point in time relevant to the complaint herein have experienced scheduling for "double" shifts.

### *10-Hour Spread Rule*

153.     At some point in 2006, TL Cannon recognized that employees whose work time spanned more than 10 hours from the first minute to the last minute of their work day were subject to New York's 10-hour spread rule and entitled to one additional hour of pay for that day. However, TL Cannon's purported policy stated the 10-hour spread rule applied **only to Servers**.

154.     Moreover, rather than having the payroll department or the computerized timekeeping system in each restaurant automatically identify those Servers (as opposed to all entitled employees) who were entitled to the additional hour under the 10-hour spread rule, the Defendants created a separate procedure whereby individual restaurant managers were supposed

to manually identify all the 10-hour spread shifts for a particular restaurant's Servers each week by manually reviewing the restaurant's time clock records.

155.     Once the 10-hour spread shifts were identified by individual server and shift, each restaurant was then supposed to send a separate report list to the payroll offices in Florida on a weekly basis so that the payroll office could then "manually" add the additional hour of pay to the applicable employees' paychecks.

156.     In instances where a manager forgot to complete the 10-hour spread list, missed an entitled employee, or for some other reason never provided the list to the payroll department, there was never any follow-up from the company and those employees would not receive the additional hour for their 10-hour spread shift.

157.     Moreover, no one from the payroll department in Florida nor any of the various Directors of Operations overseeing the individual TL Cannon restaurants ever verified on a regular basis if a particular store submitted its 10-hour spread list or the accuracy of that list.

158.     Upon information and belief, a Server who worked a qualifying 10-hour spread shift almost never received the entitled-to additional hour of pay because that shift was either never reported or the manager reporting failed to do so properly so that it would be paid.

159.     Moreover, TL Cannon never paid **any** other employees under any other job code than servers an additional hour of pay pursuant to the 10-hour spread requirements under NYLL.

160.     Upon further information and belief, the Defendants have had both actual and constructive knowledge of the 10-hour spread requirements and should have known that plaintiffs and those similarly situated were not being paid the required additional hour under the 10-hour spread requirement.

*Payment for All Hours Worked*

161.    Under New York's 10-hour spread rule and split shift rule, plaintiffs and those similarly situated were at various times entitled to an additional hour of pay.

162.    Upon information and belief, that additional hour of pay was an additional hour of work time to which plaintiffs and those similarly situated were entitled to on the day that the obligation to credit the additional hour occurred.

163.    In those weeks when the additional hour of pay would have resulted in a work week of more then 40 hours, plaintiffs and those similarly situated were entitled to overtime pay under New York and Federal law.

164.    Employee breaks were dependant upon the flow of business in the restaurant, whether it was busy, and whether anyone was available to work that employee's position to enable him/her to take a break.

165.    However, upon information and belief, at the end of every day after every employee has clocked out, TL Cannon's policies, customs, and guidelines require the closing manager to edit all of the restaurant's time clock entries, **for all employees**, for the entire day, and to manually enter breaks for those employees whose time records do not reflect a proper break under NYLL.

166.    For those employees whose time records are changed from no break to one reflecting a break, the employee is supposed to sign a "break log" which purportedly affirms that the employee did in fact actually take the break that is being subtracted from their time clock entries for that particular day.

167.    In many circumstances, employees are not given a choice as to whether to sign the break log, regardless of whether they have taken a break or not.

168.    Upon information and belief, employees are required to sign the break log and managers are required to discipline employees who "forget" to sign the break log or who refuse to do so (i.e, a server who is normally scheduled as a 2 or 3 station suddenly finds themselves scheduled as a 7 or 8 for two or three weeks at a time or a Line Cook who normally closes on a particular night is now only scheduled to work the "V" or "volume" shift, thereby losing 2-3 hours of work).

169.    However, when an employee clocks out at the end of every shift, the time clock function on the computer prints a time sheet of the employee's hours for the day and provides the option to print the employee's time clock record for that week.

170.    Many times, it is only when an employee clocks out for the day, prints a weekly time clock record for that week, and compares the weekly reports printed at the end of every shift to the previous days' report that the employee would become aware their time clock record had in fact been altered with an artificially inserted break.

171.     Moreover, upon information and belief, plaintiffs and those similarly situated often have a break deducted from their time clock entries when, in fact, no break was actually taken, losing 30 minutes of pay every time the employee's time clock entries are modified.

172.    For example, attached hereto as **Exhibit "1"** are time clock records for Matthew Roach, which he printed at the end of his shifts from November 2, 2009 through January 18, 2010, numbered 1 through 40.

173.    Also attached hereto as **Exhibit "2"** are paychecks for Matthew Roach for his employment from November 2, 2009 through January 3, 2010.

174.    In reviewing and comparing Exhibits 1 and 2, it is important to note that for over just an 11-week period:

a.    There are at least 16 instances where his time clock entries were edited to insert a 30 minute break which was deducted from his work time;

b.    There are at least 27 instances where his time clock records show a shift of more than 6 hours without a break, regardless of whether it was shown as edited in a later time clock record, leaving a total of 11 instances where he worked a shift *longer* than 6 hours without a break and <u>it was not</u> edited; and

c.    In the 9 week period covered by the 8 paychecks in Exhibit "2," 7 of the paychecks are missing at least 30 minutes (.50 hours) of paid time when compared to the final time clock record for the corresponding week and all of them are missing significantly more time if the changed time clock entries which show subtracted purported break times are also accounted for.

175.    The named plaintiffs, opt-in plaintiffs and dozens of putative class members that have provided declarations in this action and all other similarly situated employees, have experienced and continue to experience the effects and results of having time clock records modified to add in breaks under a purported attempt to comply with legal requirements and have not been paid all the hours they have worked as a result of the missing "break" time.

176.    In fact, it is the custom, policy, and expectation based upon TL Cannon's labor guidelines and at the direction of the upper level management and Defendants to make sure that employee breaks are edited into all appropriate time records by the closing manager at the end of every day, without exception.

**FIRST CLAIM FOR RELIEF**
**(Laundry Fees)**

177.    The plaintiffs repeat each and every allegation previously made here and as if set forth fully herein.

178.    Under NYLL, plaintiffs and similarly situated hourly employees are entitled to receive laundry fees in addition to the hourly cash wages.

179.    Defendants have failed to pay plaintiffs and similarly situated hourly employees the required laundry fees in addition to their wages as required by NYLL §§ 652, 655, 663, and, 12 NYCRR § 137-1.8.

180.    Upon information and belief, Defendants, including the individual Defendants herein, willfully, purposefully, and maliciously failed to pay the required compensation as articulated in this claim for relief.

181.    Plaintiffs seek monetary damages for the payment of all unpaid laundry fees under NYLL, and, where appropriate and permitted by law, liquidated damages, interest, and attorneys' fees in an amount to be determined by the Court.


**SECOND CLAIM FOR RELIEF**
**(Uniform Fees)**

182.    The plaintiffs repeat each and every allegation previously made here and as if set forth fully herein.

183.    Under NYLL, plaintiffs and similarly situated hourly employees are entitled to reimbursement for the money spent on purchasing Defendant's required uniforms as a condition of employment.

184.    Though plaintiffs and similarly situated hourly employees are entitled to reimbursement, Defendants have never provided reimbursement for required uniform fees and expenditures as an addition to plaintiffs wages as required by NYLL §§ 652, 655, 663, and 12 NYCRR § 137-1.8.

185.    Upon information and belief, Defendants, including the individual Defendants herein, willfully, purposefully, and maliciously failed to pay the required compensation as articulated in this claim for relief.

186.    Plaintiffs seek monetary damages for the payment of all unpaid uniform fees under NYLL, and, where appropriate and permitted by law, liquidated damages, interest, and attorneys' fees in an amount to be determined by the Court.

## THIRD CLAIM FOR RELIEF
### (Spread of Hours)

187.    The plaintiffs repeat each and every allegation previously made here and as if set forth fully herein.

188.    Under NYLL, plaintiffs and similarly situated hourly employees are entitled to be paid one additional hour of work as part of their wages where plaintiffs' "Spread of hours" exceeds 10-hours, as that term is defined in 19 NYCRR §§ 137-3.11 and 142-2.18.

189.    Even though plaintiffs and similarly situated employees are entitled to an additional hour of work time as part of their wages pursuant to the "Spread of Hours" rule, Defendants continue to refuse payment of the additional hour as required under NYLL §§ 652, 655, 663, and 12 NYCRR §§ 137-1.7, 137-2.6, 142-1.1, and 142-2.4.

190.    Upon information and belief, Defendants, including the individual Defendants herein, willfully, purposefully, and maliciously failed to pay the required compensation as articulated in this claim for relief.

191.    Plaintiffs seek monetary damages for monies owed to plaintiffs due to Defendants' willful, purposeful, and malicious refusal to pay plaintiffs and/or similarly situated hourly employees an additional hour of pay consistent with the Spread of Hours rule as well as the payment of all unpaid Spread of Hours under NYLL, and, where appropriate and permitted by law, liquidated damages, interest, and attorneys' fees in an amount to be determined by the Court.

{W0155112.1}                                              32

## FOURTH CLAIM FOR RELIEF
### (Rest Time, Regular Time, and Overtime under NYLL)

192.    The plaintiffs repeat each and every allegation previously made here and as if set forth fully herein.

193.    Under NYLL, plaintiffs and similarly situated hourly employees are entitled to a half hour break when their scheduled shift exceeds 6 hours.

194.    Additionally, Plaintiffs and similarly situated employees are also entitled to be paid for all hours worked, including but not limited to those hours as articulated in the Third and Fourth Claims for Relief, and at an overtime rate of one and one-half times the regular hourly rate when their total hours exceeded 40 hours per week.

195.    Even though plaintiffs and similarly situated employees are entitled a half-hour rest breaks, and to be paid for all hours worked including overtime rates for hours exceeding 40 per week, Defendants continue to refuse to provide said breaks or pay plaintiffs and those similarly situated for all hours worked at the appropriate rate of pay as required under to NYLL §§ 190, *et seq*, 650, *et seq*, and, 19 NYCRR §§ 137 and 142, *et seq*.

196.    Upon information and belief, Defendants, including the individual Defendants herein, willfully, and purposefully failed to pay the required compensation or provided the required rest periods as articulated in this claim for relief.

197.    Plaintiffs seek, where appropriate and permitted by law, monetary damages for the repayment of all unpaid Spread of Hours time, regular work hours, overtime work hours, liquidated damages, interest, and attorneys' fees in an amount to be determined by the Court.

## FIFTH CLAIM FOR RELIEF
### (Unpaid Wages and Overtime under FLSA)

198.    The plaintiffs repeat each and every allegation previously made here and as if set forth fully herein.

199.    The plaintiffs and similarly situated hourly employees of TL Cannon bring this claim for relief pursuant to the Fair Labor Standards Act ("FLSA") at 29 U.S.C. § 201, *et seq.*

200.    Under the FLSA, plaintiffs and similarly situated hourly employees are entitled to be compensated for all hours worked, including those hours articulated in the Third, Fourth, and Fifth Claims for Relief, where such time is compensable time and is also subject to the regular time and overtime provisions of sections 206 and 207 of the FLSA.

201.    Defendant TL Cannon willfully, knowingly, purposefully, and recklessly failed to pay plaintiffs and similarly situated hourly employees for all time worked, including time which would have qualified as overtime.

202.    Upon information and belief, plaintiffs and those similarly situated hourly employees frequently worked more hours than what they were paid for and frequently had adjustments made to their time clock records, often without their knowledge, resulting in a paycheck for less time than what the plaintiffs actually worked.

203.    On this claim for relief, the plaintiffs on behalf of themselves and other similarly situated hourly employees of TL Cannon seek payment of all unpaid wages and unpaid overtime wages, such sums to be determined based upon an accounting of the hours worked and wages actually paid for the plaintiffs and other similarly situated employees.

204.    The plaintiffs also seek an award of liquidated damages in the amount of 100% of the unpaid regular and overtime wages, plus attorneys' fees, interest, and costs as provided for by the FLSA.

## DEMAND FOR TRIAL BY JURY

205.    Pursuant to Federal Rule of Civil Procedure 38, plaintiffs respectfully request a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, it is respectfully requested that this Court assume jurisdiction herein and thereafter plaintiffs demand a trial by jury and judgment against defendants on behalf of themselves and those similarly situated as follows:

a.    On the First Claim for Relief, monetary damages resulting from Defendants' continuing conduct of withholding laundry fees from plaintiffs and similarly situated employees, as well as the payment of all unpaid laundry fees, liquidated damages, and attorneys' fees in an amount to be determined by the Court;

b.    On the Second Claim for Relief, monetary damages resulting from Defendants' continuing conduct of withholding reimbursement for uniform fees that were due to plaintiffs and similarly situated employees, as well as the payment of all unpaid uniform fees, liquidated damages, and attorneys' fees in an amount to be determined by the Court;

c.    On the Third Claim for Relief, monetary damages resulting from Defendants' continuing conduct of withholding an additional hour of pay from plaintiffs and similarly situated hourly employees that is legally due to plaintiffs and similarly situated hourly employees under the Spread of Hours rule, as well as the payment of all unpaid hours, liquidated damages, and attorneys' fees in an amount to be determined by the Court;

d.    On the Fourth Claim for Relief, monetary damages resulting from Defendants' continuing conduct of refusal to pay plaintiffs and similarly situated hourly employees for all time to which they were legally entitled, and for the repayment of all unpaid hours, liquidated damages, and attorneys' fees in an amount to be determined by the Court; and

e.    On the Fifth Claim for Relief, monetary damages equal to the amount of unpaid wages and unpaid overtime wages of hourly employees that were unlawfully withheld from plaintiffs and other similarly situated employees, such sums to be determined based upon an accounting of the hours worked and wages actually paid for the plaintiffs and other similarly situated employees, as well as an award of liquidated damages in the amount of 100% of the unpaid regular and overtime wages, plus attorneys fees, interest and costs;

Dated:  August 10, 2012                              Yours, etc.

                                        s/ Frank S. Gattuso
                                        Frank S. Gattuso, Esq.
                                        Bar Roll No.:  513636
                                        Dennis G. O'Hara, Esq.
                                        Bar Roll No: 102293
                                        O'HARA, O'CONNELL & CIOTOLI
                                        *Attorneys for the Plaintiffs*
                                        7207 East Genesee Street
                                        Fayetteville, New York 13066
                                        Telephone: (315) 451-3810